## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DOCTOR'S ASSOCIATES INC. )<br><br>Plaintiff, )<br><br>v. )<br><br>JESAL DESAI, SHAPAT, INC., SHAPAT )<br>II, LLC. SHAPAT III, LLC and PATWARI, )<br>LLC., )<br><br>Defendants. )<br><br>JESAL DESAI, SHAPAT, INC., SHAPAT )<br>II, LLC., SHAPAT III, LLC., and )<br>PATWARI, LLC., )<br><br>Plaintiffs, )<br><br>v. )<br><br>DOCTORS ASSOCIATES INC. and )<br>SUBWAY REAL ESTATE )<br>CORPORAITON )<br><br>Defendants. )<br> ) | Civil Action No. 08-3363 (WJM-MF)<br><br>Judge: Hon. William J. Martini, USDJ<br><br><br><br><br><br><br><br><br><br>**CERTIFICATION OF JESAL DESAI IN SUPPORT OF MOTION TO REFER THE PENDING CONSOLIDATED MATTERS TO THE U.S. BANKRUPTCY COURT** |

I, Jesal Desai (also known as Jesal Patwari), hereby certify as follows:

1. I am the defendant and one of the consolidated plaintiff in the above referenced matter. I am an officer of the defendant/consolidated plaintiff companies, Shapat, Inc., Shapat II, LLC., Shapat III, LLC., and Patwari, LLC. I am fully familiar with the facts of this case and make this certification in support of

defendants'/consolidated plaintiffs' motion to refer the pending matters to the bankruptcy court.

2. There has been an ongoing dispute between me, the corporate entities I own and the plaintiff and its affiliate entity; Subway Real Estate Corp. It is necessary that I outline the history of the dispute and the relationship I had with the plaintiff/consolidated defendants.

## HISTORY OF THE LITIGATION

3. On or about August 27, 2008, all the defendants/consolidated plaintiffs, including myself, filed for Chapter 11 bankruptcy protection. **Exhibit "A".**

4. In March of 2007, DAI proceeded for arbitration for some of the stores. Subsequently, it amended its submission to add more disputes and stores.

5. After the arbitration awards purported to terminate my franchises, DAI, through its real estate affiliate Subway Real Estate Corp., commenced "holdover" eviction proceedings to dispossess my stores pursuant to a clause in the sublease that my rights to the space terminated if the franchise was terminated.

6. On October 15, 2007, I filed a lawsuit against DAI and SREC by way of an Order to Show Cause and Verified Complaint in the Chancery Division of the Superior Court of New Jersey. (Case captioned Jesal Desai, Shapat, Inc., Shapat 2, LLC, Shapat 3, LLC, and Patwari, LLC v. Doctors Associates, Inc. and Subway Real Estate Corp., docket no. ESX-C-314-07. (Herein, "the State Court Action"). Although originally filed in Middlesex County, the case was transferred to Essex County. In the Complaint, I asked the Court for a judgment (a) finding that DAI and Subway Real Estate Corp. had violated the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1,

*et seq.*, (b) reforming the franchise agreements, and (c) staying of Subway Real Estate Corp.'s termination of my leases.  **(Exhibit B)**.

7.  In October 2007, the parties were in Court on my application for a Preliminary Injunction.  Counsel for DAI and SREC agreed to maintain the status quo until the Order to Show Cause application was decided by the court.  **(Exhibit C),** transcript of Judge Levy decision, at p. 13.)  As such, they agreed to continue to supply my Subway Restaurants, to allow me to operate my businesses, and to cease their efforts to dispossess me.

8.  At Judge Levy's request, the judges hearing the pending eviction cases agreed to stay the actions pending before them and maintain the status quo until Judge Levy could render a decision on my request for a preliminary injunction.

9.  The legal issues were briefed extensively by the parties in the State Court. Judge Levy heard oral argument on January 8, 2008 and again on February 1, 2008.

10. On February 1, 2008, Judge Levy read his decision.  He granted my request for a preliminary injunction.  He preliminarily held DAI's franchise agreements to be contracts of adhesion, containing numerous unconscionable provisions.  He further found that I would be irreparably harmed if DAI were permitted to terminate my franchises, as purportedly done by the arbitration awards, pending final decision by the Court on whether those portions of the franchise agreements were unconscionable.  He found on the record:

> I do believe that the franchisee in this case has also demonstrated not only a probability of - - of a success on the merits but also irreparable harm if the Court does not enter this injunction.  Loss of a business is not something that is easily calculable in money damages.  And once that business is lost trying and - - and if your prevail later on in

3

litigation, trying to determine what the damages would - - what the damages are up until that point and what the damages caused by the loss of business for a substantial period of time would be out into the future, certainly something that would be difficult to establish if not even predict.  And it is the - - it is in those kind of cases in my opinion that case law supports injunctive relief.

**(Exhibit D)**, Transcript of February 1, 2008 Decision, at p. 31-32) (emphasis added).

11. Judge Levy further found that a weighing of the equities cut in my favor to maintain the status quo:

I also think that a - - weighing of the equities in - - in this case particularly in view of the one-sided nature of the agreements as I have just outlined and given the damage that most certainly will be caused to the plaintiff that the equities weigh clearly in favor of the injunctive relief and weigh in favor of the plaintiff…"

**(Exhibit E)**, Transcript of February 1, 2008 Decision, at page 32) (emphasis added).

12. With regard to the eviction cases already pending in the Superior Court of New Jersey, Landlord-Tenant part in Hudson and Essex counties, Judge Levy stated that under the Court Rules he could not enjoin other Superior Courts, therefore, he would instead enjoin DAI and Subway Real Estate Corp. from using the arbitration awards which stated that my franchise agreements were terminated.  He thereby in effect stayed those cases which were premised on the termination claim.  **(Exhibit D)**, Transcript of February 1, 2008 Decision, at page 32-33.)  The Honorable Mahlon L. Fast, J.S.C., dismissed the eviction case pending in Hudson County in light of Judge Levy's preliminary findings that the underlying franchise agreement is unconscionable.  **(Exhibit F)**.

4

13. On February 26, 2008, Judge Levy signed a written Order expressly stating that DAI and Subway Real Estate Corp. "are preliminarily enjoined from enforcing the four (4) Arbitration Awards entered September 26, 2007 . . . to preserve the status quo and from using the said Arbitration Awards as evidence in any pending proceeding between these parties until further Order of this Court..." **(Exhibit G)**, Order dated February 26, 2008) (emphasis added).

14. DAI was preliminarily enjoined from using the arbitration awards which purportedly terminated my franchises.  It was further ordered to maintain status quo.

15. While the status quo was being maintained, I was able to successfully operate my four Subway stores.  In fact, the stores operated very successfully.  DAI sent letters commending the sales at the stores.  DAI specifically wrote, "We hope the great sales trend and momentum continues.  Franchisee profitability is the cornerstone of our 2010 Strategic Plan.  Together with our partners in the field we continue to work on finding new and improved ways to help you build your business." **(Exhibit H).**

16. After the Order was entered in Superior Court, I continued reporting my weekly sales to DAI so that DAI could withdraw its royalty and advertising fees through the automated payment system.  DAI, however, continued to refuse my royalty payments by refraining from withdrawing royalty and advertising payments.

17. DAI continued to harass me through various lawsuits in landlord tenant courts. When it did not succeed, it filed lawsuits through the landlords.  It, however, continued to maintain the status quo in terms of supplying me the food, services and related franchise material. It also continued to inspect my stores.

18. *In July 2008, we were scheduled to depose Yogesh Dave, Development Agent for DAI as part of the discovery in the Superior Court case. DAI, in contravention of the preliminary injunction entered by Judge Levy and in the hope of finding a more favorable forum, filed an action against me in the District Court. DAI claimed I was infringing on their trademark despite the fact that I was operating the stores pursuant to Judge Levy's decision maintaining the status quo. DAI claimed trade mark infringement, because I continued to operate Subway stores after receiving the notices discussed above, even though as set forth in detail above, DAI's own records showed that the amounts claimed in those default notices were either due to DAI's own admitted errors, or were paid by me long ago.*

19. On August 12, 2008, the District Court entered the preliminary injunction requested by DAI, enjoining me from using Subway trademarks and from my stores "passing off" as operating authorized Subway restaurants. The conflicting orders of the two courts created a chaotic situation and compelled the defendants to seek the protection of the bankruptcy court. On or about August 27, 2008, Chapter 11 Bankruptcy petitions were filed.

20. DAI and its agents engaged in significant harassment of my employees after the filing of the bankruptcy petition. An Order to Show Cause was filed before Honorable Novalyn Winfield seeking relief. Honorable Winfield was unable to reconcile the Orders of the District Court and the State Court. (**Exhibit I**). She recognized the fact that my interest in the franchise agreement is still alive but, due to the existing injunction of the District Court, was unable to resolve the issues presented to her. (**Exhibit I**).

21. DAI had filed a Motion for Contempt on August 27, 2008, and the defendants (consolidated plaintiffs) filed a Motion to Remand the State Court matter. This court has denied my motion to remand.

22. **In the meantime, not having any definite answer from any judicial forum, the defendants had to close the stores. These stores are viable businesses and were generating revenue that I believe would have been sufficient to pay the ongoing business expenses. This closing of the stores has created significant problems for the reorganization of the business. As the core issues are not before the bankruptcy court, it is unable to make decisions that are necessary to determine the next step in the process.**

23. **Each additional day the business stays stand still and the bankruptcy court is not in a position to decide the core issues, the reorganization of my businesses becomes more difficult. Eventually, it will become impossible to reorganize unless immediate decision on some of the core issues is made by the court. The cash flow is required to propose a reorganization plan.**

## HISTORY OF DEFENDANTS' BUSINESS RELATIONSHIP WITH DOCTOR'S ASSOCIATES, INC. AND ITS AFFILIATE SUBWAY REAL ESTATE CORP.

24. In my individual capacity, I entered into four (4) franchise agreements with Doctor's Associates, Inc. ("DAI") to own and operate four (4) Subway sandwich restaurants ("Subway Restaurants"). DAI, a Florida Corporation, is the franchisor of "Subway" brand franchised sandwich restaurants. According to DAI, it has over 29,000 Subway franchises in over 86 countries.

25. As detailed below, I opened the four Subway Restaurants - - one in Montclair, one in Guttenberg, and two in Bloomfield. I sublease these properties from defendant Subway Real Estate Corp ("SREC"), an affiliate of DAI, which is in the business of leasing commercial premises for use as Subway sandwich restaurants. Upon information and belief, SREC is owned and controlled by DAI. SREC is the master tenant for the business premises. I am the subtenant for each Subway restaurant business in my individual capacity.

26. I operated my four Subway Restaurants through Shapat, Inc. (a New Jersey Corporation), Patwari, LLC (a New Jersey Limited Liability Company), Shapat 2, LLC (a New Jersey Limited Liability Company), and Shapat 3, LLC (a New Jersey Limited Liability Corporations) (collectively "The Operating Companies"). These are corporate and trade names under which the business of the four franchised stores is conducted.

27. To create each of my four Subway Restaurants, I invested a great deal of money, time and effort in each store. These businesses have taken more than 6 years of my life. All of my money, and a great deal of funds loaned by banks and individual lenders, have been invested in these business ventures. All the loans are personally guaranteed by me.

28. My initial investment in the four stores was approximately $740,000, most of which was borrowed from various financial institutions and individuals. To continue operations, I obtained additional loans exceeding $180,000. My total investment in these stores is over $920,000, including a home equity loan of approximately $128,000. I have also been compelled to borrow money to finance numerous

litigations that have been initiated by DAI and SREC to close my businesses based upon accusations that are incorrect and disputed by me.

### (A)    Subway store number 27800 at 49 Claremont Avenue, Montclair, NJ

29. In June of 2002, I entered into a franchise agreement with DAI, identified as Franchise Agreement No. 27800, pursuant to which I opened Subway Store No. 27800 in approximately April 2003.

30. In accordance with the Franchise Agreement, DAI and Subway Real Estate Corp., DAI's affiliate, handled the site selection evaluation and approvals for the store location, negotiated the real estate lease with the property owner, and sublet the premises to me.   Specifically, Subway Real Estate Corp. entered into a lease agreement dated November 7, 2002, for premises at 49 Claremont Avenue, Montclair, New Jersey, and by sublease dated January 3, 2003, sublet the premises to me.

31. This was a new location for a Subway restaurant.  I invested approximately $190,000 (one hundred ninety thousand dollars) to construct and open store 27800.  To finance this store, I obtained a loan in the approximate amount of $170,000 from Subhash Shah and signed a promissory note.

32. The leased space is approximately 1800 square feet.  The initial rent for the premises was approximately $3,700.00 per month.   The current rent for these business premises is approximately $4,560.00 per month.   I pay the rent directly to the property owner, not Subway Real Estate Corp.

**(B)Subway store number 29895 at 6901 Bergenline Avenue, Guttenberg, NJ**

33. In November of 2002, I entered into Franchise Agreement No. 29895, pursuant to which I opened Subway Store No. 29895 in approximately January 2004.

34. In accordance with the Franchise Agreement, DAI and Subway Real Estate Corp. handled the site selection evaluation and approvals for the store location, negotiated the real estate lease with the property owner, and sublet the premises to me. Subway Real Estate Corp. entered into a lease agreement dated August 30, 2003, for premises at 6901 Bergenline Avenue, Guttenberg, New Jersey and by sublease dated October 13, 2003, sublet the premises to me.

35. I invested approximately $185,000 to acquire this franchise and open this store. This was a new Subway location and constructed by me at my own expense. I obtained financing for this venture in the amount of approximately $120,000 from the United Trust Bank (now PNC Bank).

36. The leased space for the business is approximately 1500 square feet. The monthly rent currently for this space is approximately $5,600. I pay the rent directly to the property owner, not Subway Real Estate Corp.

**(C)    Subway store number 15953 at 595 Bloomfield Avenue, Bloomfield**

37. In January 2006, I signed transfer documents pursuant to which, with DAI's approval, I took over the operations of an existing Subway restaurant at 595 Bloomfield Avenue, Bloomfield; in May 2006, I signed franchise agreement no. 15953 for that store.

38. Since this was an existing Subway location, Subway Real Estate Corp. already had a lease agreement with the property owner and a sublease with the prior franchisee. By

Assignment of Sublease dated May 3, 2006, I assumed the sublease with Subway Real Estate Corp.

39. I was required to extensively renovate and refurbish this location at a cost of approximately $165,000. To pay for the remodeling, I obtained a $100,000 loan from Commerce Bank, I borrowed $25,000 from IFC Corporation to finance equipment, and the balance was financed by obtaining a personal loan in the amount of $40,000.

40. The space leased for this location is approximately 1200 square feet. The current rent is approximately $2,400 per month. I pay the rent directly to the property owner, not Subway Real Estate Corp.

**(D)    Subway store number 40217 at 135 Bloomfield Avenue, Bloomfield,**

41. In May of 2006, I entered into Franchise Agreement No. 40217.

42. In accordance with the Franchise Agreement, DAI and Subway Real Estate Corp. handled the site selection evaluation and approvals for a store location, negotiated the real estate lease with the property owner, and sublet the premises to me. Subway Real Estate Corp. entered into a lease agreement dated June 27, 2006 for premises at 135 Bloomfield Avenue, Bloomfield, New Jersey, and by sublease dated July 20, 2006, sublet the premises to me.

43. This was a new location for a Subway restaurant. I expended approximately $200,000 to construct and open the store, including a loan of approximately $123,000 from GE Capital.

44. The leased space leased is approximately 2,000 square feet and the rent is approximately $4,500 per month. I pay the rent directly to the property owner, not Subway Real Estate Corp.

## THE EXECUTION OF THE FRANCHISE AGREEMENTS

45. I was given copies of the franchise agreements and disclosure documents. Many of the provisions of the franchise agreements are completely one sided and offer no protection to me. However, I was told by DAI that in order for me to become a franchisee, I must sign them "as is," and that no changes would be made, even if I retained a lawyer.

46. When I subsequently sued DAI in the Chancery Division of the Superior Court of New Jersey, the Honorable Kenneth S. Levy, P.J.Ch. found that DAI's franchise agreements are contracts of adhesion containing many unconscionable provisions. A true and complete copy of the transcript of Judge Levy's decision is attached hereto as **Exhibit J.** In particular, Judge Levy found:

> "I am convinced, as I said before, that we have a contract of adhesion containing numerous unconscionable provisions."

## THE DISPUTE WITH DEFENDANTS

47. I have been battling DAI for the last two years. Unfortunately, DAI's tactics and the costs they have imposed upon me and my stores have forced me to seek the protection of the Bankruptcy Court.

48. DAI has wrongfully attempted to directly and indirectly terminate my franchises, accused me of failing to pay royalties, cut off all supplies to my stores, and enjoined my use of Subway trademarks, all in violation of the New Jersey Franchise Practices Act.

### The Alleged Default And Non Payment Of Royalties

49. DAI filed an Order to Show Cause Application with this court by representing I have defaulted and failed to pay royalties. Under the terms of the Franchise Agreements,

Subway franchisees must pay DAI a royalty of 8% of the gross sales for each restaurant. DAI also collects an additional 4.5% of the gross sales for the Subway Advertising Trust Fund. DAI routinely issued "Default Notices" claiming additional royalties and trust fund payments were due. However, DAI's figures were fraught with errors. At times I would pay the amounts claimed because I was too busy trying to run my stores to dispute them. Other times, I would dispute the charges. <u>Oftentimes, DAI acknowledged their error and issued credits to me. Nonetheless, even after issuing the credits they proceeded to terminate my franchises based on these very same notices.</u> These include the Default Notices underlying DAI's current actions against me including an Order to Show Cause Application which resulted in an injunction against me. This action of DAI triggered the need for Bankruptcy Protection.

50. For example, looking at the notices DAI relied upon to claim my four franchises were terminated, by notice dated November 17, 2006, DAI claimed that for store 15953, I owed an additional $961.42 in royalty payments and $826.24 in advertising fees. **(Exhibit K).** The notice stated that my franchise was terminated unless the "defaults" were cured within ten days.

51. I disputed DAI's claim and I was correct. On or about January 9, 2007, Subway issued me a credit in the amount of $956.17 against their royalty claim of $961.42. This credit can be seen Subway's own Accounting Inquiry Detail Report for store 15953. **(Exhibit L).** (DAI similarly eliminated the erroneous advertising fee charge, however advertising trust fund charges and credits are not shown on the Accounting Inquiry Detail Report.)

52. Notwithstanding that the "Default" was, in fact, DAI's own admitted error, and notwithstanding that the purported default was "cured" by January 2007, in July 2008 DAI filed a Complaint alleging this notice as the basis for the termination of my franchise for store 15953.

53. By notice dated November 24, 2006, DAI claimed I also owed an additional $1,215.07 in royalty payments and $560.99 in advertising fees for store 29895. **(Exhibit M)** The notice stated that my franchise was terminated unless the default was cured within ten days. DAI's own "Accounting Inquiry Detail Report" shows that the alleged default was paid by December 5, 2006, i.e. less than 10 days from the notice. **(Exhibit N).** Nonetheless, in DAI's July 2008 Complaint, DAI alleged this notice as the basis for the terminating my franchise for store 29895.

54. On or about February 26, 2007, DAI served me with another Notice of Default, claiming that I owed an additional $2,314.99 in advertising payments for store 27800. **(Exhibit O).** I disputed the amounts, and once again DAI was forced to correct their figures and issue me a credit. Although DAI does not provide printouts of advertising charges and credits, DAI's "Accounting Inquiry Detail Report," attached as **Exhibit P** shows that on or about March 6, 2007, DAI issued me a large $2,465 credit on my royalty payments. Royalty payments and advertising charges are calculated from the same sales figures. Thus, the Accounting Inquiry Detail Report, although showing the royalty fees credit, corroborates that the advertising fees were similarly credited.

55. Notwithstanding that the February 26 Default Notice was issued in error, and that DAI itself issued the credits within 10 days, in its July 2008 Complaint, DAI alleged this notice as the basis for the terminating my franchise for store 27800.

56. On or about April 5, 2007, DAI served yet another Notice, this time claiming that I owed an additional $2,271.94 in advertising payments for store 40217. **(Exhibit Q)**. I disputed this figure, however the dispute was not resolved before litigation commenced. I am waiting for DAI to serve its outstanding and overdue discovery to determine how DAI arrived at this figure.

57. As set forth above, DAI audited my stores. By letter dated July 12, 2007 from the law firm Gray, Plant, Mooty, Mooty & Bennet ("GPMMB"), DAI notified me that it had completed an "audit" of stores 27800 and 29895, and that based upon these audits DAI determined it was due an additional $42,546.05, including $8,500 charged for the purported cost of conducting the audit, and $2,111 for "interest" **(Exhibit R).**

58. I know my business and I know the sales that my stores generate. These figures were clearly erroneous; the audit relied upon inaccurate sales figures, projections and assumptions, and not the actual sales figures. After receiving the July 12, 2007 letter, I spoke with Tracy Castillo at GPMMB over the phone and advised that I wished to dispute the audit's calculations. A teleconference was scheduled for August 17, 2007, as set forth in the July 12 letter from GPMMB, so that I could explain why the audit figures were incorrect.

59. Before the scheduled teleconference, a dispute arose between DAI and me over three checks I tendered to pay certain royalties. Once again, DAI was threatening me with imminent termination and eviction unless I paid purported arrears. DAI required that the payments to be made by cashiers check or certified check. Although PNC Bank did not ordinarily issue certified checks, the head teller agreed to do so in this instance because the branch did not have any cashiers check "blanks." I deposited

sufficient funds for the checks, as demonstrated by the bank receipts. **(Exhibit S).** However, when DAI negotiated the checks, two of them were inexplicably not honored by PNC Bank. By letter dated August 7, 2007, Forrest Scott Turkish, Esq., accused me of fraud and advised that DAI absolutely no longer wanted me as a Subway franchisee.

60. On August 17, the date scheduled for the teleconference on the audit, I called the number for the teleconference center and followed the instructions in the July 12 letter from GPMMB. However no one from GPMMB or Subway got on the line to participate in the conference. I called a second time, with the same result. DAI never gave me an opportunity to rebut their "audit" figures with GPMMB. Instead, DAI added the audit claim to a prior dispute it had previously submitted to arbitration.

### The Arbitration Process

61. In March of 2007, DAI filed for arbitration seeking an arbitration award terminating my franchises based upon its calculations of the royalties it purported were unpaid and owing.

62. After receiving the notices, I approached DAI and again disputed the amounts they were claiming. I needed to retain a lawyer but did not have the money to waste. Therefore, I tried to speak with DAI's representatives to resolve the problem and asked for adjournment of the arbitration process. When DAI did not agree to anything, I was compelled to retain a lawyer as I did not understand my rights and did not want to participate in the process without proper guidance.

63. The hearing date was very close at the time when I asked for adjournment. DAI had submitted a thick stack of papers related to their "audit." My attorney asked for

adjournment so that she could have time to understand the issues and the process without waiving my right to object to the arbitration process. We objected to the arbitration process.

64. DAI's attorneys proceeded in the arbitration without me, and obtained a default award over my objections. It did not matter to DAI that its royalty calculations, which were based upon assumptions and not the actual sales, were wrong. It did not matter to DAI that I had questioned the arbitration and had refused to participate because I had serious reservations about DAI's rights to arbitrate the dispute under the circumstances.

65. In August 2007, before the arbitrator even issued his default awards, DAI's attorney Forrest Scott Turkish, Esq., sent me four letters that DAI terminated by franchise agreements and that Subway Real Estate Corp. terminated my sublease agreements.

66. The default arbitration awards were obtained on or about September 5, 2007. After that, DAI refused to accept royalty payments from me based upon its position that my franchise agreements do not exist.

67. Royalty payments are made to DAI through an automatic deduction system whereby DAI withdraws royalty and advertising fees directly a franchisees' bank accounts. Each time I change banking institutions, I notify DAI and provide DAI with the completed authorization forms so that DAI can make the withdrawals. **(Exhibit T).** In September of 2007 I changed banks. By September 18, I provided DAI with my account information and signed authorizations permitting DAI to pull royalty fees from my accounts. DAI confirmed in writing that it received the information and had set up the accounts. **(Exhibit U).**

68. DAI, however, refused to accept royalty payments from me, and did not withdraw the royalty fees or advertising fees from my account. It has thereby dramatically inflated its claims of the amounts owed and purportedly unpaid by me. A DAI representative informed me that DAI is not pulling the funds out of the account because of its position that the franchise agreements have been terminated.

## DAI'S BAD FAITH AND HARASSMENT

69. DAI has taken my business away based upon false accusations and based upon its financial resources. It is a franchiser who kills it franchisees and relies upon predatory practices. I request the court to look into the history of DAI's practices and the harassment I have endured at its hands before ruling on its application for contempt. My whole life's earnings and several years of my life have bee devoured by this company and I have been left on the streets without a job and without any resources to make a living. In today's economy, not even well qualified people have a job and only god knows how I am going to survive.

70. **I have detailed the facts and background to show to the court how intertwined is the bankruptcy process with the matter pending before this court. The bankruptcy court cannot make any meaningful decision and cannot do justice unless all the core issues are before the bankruptcy court. The time is of the essence here and nothing can be done unless the bankruptcy court has an opportunity to look at the issues as quickly as possible. It can happen only if the pending matters are immediately referred to the bankruptcy court. As all the issues pertaining to the assets are not before the bankruptcy court, it has created significant legal confusion for the bankruptcy court and has made a**

**reorganization difficult as certain issues need to be decided immediately.**

**(Exhibit I)**

I certify that the foregoing statements are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:  October 22, 2008

_Jesal Desai_
Jesal Desai, Defendant